Sean P. Nalty CA Bar No. 121253
sean.nalty@ogletreedeakins.com
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
Steuart Tower, Suite 1300
One Market Plaza
San Francisco, CA  94105
Telephone:    415.442.4810
Facsimile:     415.442.4870

Byrne J. Decker, *Pro Hac Vice*
bdecker@pierceatwood.com
PIERCE ATWOOD LLP
Merrill's Wharf
254 Commercial Street
Portland, ME  04101
Telephone:    207.791.1152
Facsimile:     207.791.1350

Attorneys for Defendant
SUN LIFE ASSURANCE COMPANY OF CANADA

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE

| | |
|---|---|
| BAY AREA ROOFERS HEALTH AND WELFARE TRUST, its JOINT BOARD OF TRUSTEES, and KEITH ROBNETT and BRUCE LAU, as Trustees,<br><br>Plaintiffs,<br><br>v.<br><br>SUN LIFE ASSURANCE COMPANY OF CANADA, and DOES 1-10, inclusive,<br><br>Defendant. | Case No. 5:13-cv-04192-BLF<br><br>**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITES IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:           August 7, 2014<br>Time:          9:00 a.m.<br>Before:        Hon. Beth Labson Freeman<br>                   Courtroom 3, 5th Floor<br><br>Complaint Filed:  September 10, 2013<br>Trial Date:<br>Judge:          Hon. Beth Labson Freeman |

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    Undisputed Facts ............................................................................................... 2

  A.    ARGUMENT ............................................................................................... 2

     1.    The Trustees' argument that the legality of Participant X's  "employee" status, is
           irrelevant with respect to coverage under the Stop-Loss Policy, is untenable and
           erroneous. ...................................................................................................... 2

     2.    The Trustees' efforts to distinguish *Garcia* fail................................................ 5

       a.    The Trustees' position deserves no deference............................................ 6

       b.    Sun Life's review and investigation of the Trustees' Proof of Claim, pursuant to the
             terms of the Stop-Loss Policy, is not "post-claims underwriting." ................................. 8

  C.    The Trustees attack a straw man with their repeated focus on the undisputed but  irrelevant
        fact that undocumented aliens may enforce certain mandatory provisions of state and
        federal law. ................................................................................................... 11

  D.    The Court should reject the Trustees' erroneous and inconsistent arguments to the effect
        that Sun Life's efforts to verify the Proof of Claim submitted, were at the same time both
        improper and insufficient. ................................................................................. 17

IV.    CONCLUSION ................................................................................................ 21

MEMORANDUM IN SUPPORT OF OPPOSITION TO MOTION  FOR SUMMARY JUDGMENT

1

TABLE OF AUTHORITIES

2

**Cases**

3

*AG Equip. Co. v. AIG Ins. Co.,*

4
   2009 WL 223106 (N.D. Okla. Jan. 28, 2009) ............................................................. 8

5

*AG Equip. Co. v. AIG Ins. Co.,*

6
   636 F. Supp. 2d 1210 (W.D. Okla. 2009)............................................................... 8, 10

7

*Aramark Facility Services v. Service Employees International Union, Local 1877,*
   530 F.3d 817 (9th Cir. 2008) ............................................................................... 18, 19

8

*Arizona v. United States,*

9
   132 S.Ct. 2492 (2012) ................................................................................................ 12

10

*Bollinger Shipyards v. Director,*

11
   604 F.3d 864 (5th Cir. 2010) ..................................................................................... 14

12

*Bowes v. Lakeside Indus, Inc.,*
   209 N.W.2d 900 (MN 1973) ...................................................................................... 10

13

14

*CLARCOR, Inc. v. Madison Nat. Life Ins. Co.,*
   491 F. App'x 547 (6th Cir. 2012).............................................................................. 10

15

*Computer Aided Design Sys. v. Safeco,*

16
   235 F. Supp. 2d 1052 (S.D. Iowa 2002) aff'd by 358 F.3d. 1011 (8th Cir. 2004) ........................ 7

17

*Farmers Brothers Coffee v. Wkr's Comp. App. Bd.,*

18
   133 Cal. App.4th 533 (2005)   ............................................................................... 13, 14

19

*Fink v. Union Cent. Life Ins. Co.,*

20
   94 F.3d 489 (8th Cir. 1996)........................................................................................ 10

21

*Florida Avocado Growers v. Paul,*
   373 U.S. 132 (1963) [10 L.Ed.2d 248, 83 S.Ct. 1210 ................................................ 13

22

23

*Flores  v. Amigon,*
   233 F. Supp. 2d 462 (E.D.N.Y. 2002) ....................................................................... 21

24

*Garcia v. American United Life Insurance Company,*

25
   2009 WL 6327459 (E.D. Texas December 9, 2009)(Report and Recommendation),
   adopted by 2010 WL 1379106 (E.D. Texas March 31, 2010), affirmed on appeal,

26
   422 Fed. Appx. 306 (5th Cir. 2011) ................................................................... passim

27

*Garcia-Moreno v. Great-West Life & Annuity Ins. Co.,*
   402 F. Supp. 2d 1031 (N.D. Iowa 2005) ................................................................... 16

28

*Galaviz-Zamora v. Brady Farms, Inc.*,
   230 F.R.D. 499 (W.D. Mich. 2005)..................................................... 16

*Hoffman Plastic Compounds v. National Labor Rel. Bd.*,
   535 U.S. 137, 122 S.Ct. 1275 (2002) ........................................ 1, 3, 13, 16

*In re Sergio C. Garcia*,
   58 Cal.4th 440 (2014), 315 P.3d 117 (CA. 2014) ............................ 12, 13

*Kohlhase v. Safeco Ins. Co.*,
   484 Fed. Appx. 106 (9th Cir. 2012) ..................................................... 3

*Laborer's Pension Trust Fund v. Lange*,
   2006 WL 891167 (E.D. Mich. March 27, 2006) ................................. 16

*Lewis v. Kratos Def. & Sec. Solutions, Inc.*,
   950 F. Supp. 2d 851 (E.D. Va. 2013) .................................................. 11

*Lincoln Nat. Life v. Schlanger*,
   28 A.3d 436, 441 (Del. 2011) ............................................................... 4

*Lockheed v. Spink*,
   517 U.S. 882 (1996) ........................................................................... 15

*Molina v. Mallah Organization, Inc.*,
   804 F. Supp. 504 (S.D.N.Y. 1992) ..................................................... 16

*Moon v. BWX Technologies, Inc.*,
   956 F. Supp. 2d 711 (W.D. Va. 2013).................................................. 11

*Patel v. Quality Inn South*,
   846 F.2d 700 (11th Cir.1988) ........................................................ 15, 16

*Reg'l Care Servs. Corp. v. Companion Life Ins. Co.*,
   869 F. Supp. 2d 1079 (D. Ariz. 2012) .................................................. 7

*Rivera v. NIBCO, Inc.*,
   364 F.3d 1057 (9th Cir. 2004) ............................................................ 15

*Rowello v. Healthcare Benefits, Inc.*,
   2013 WL 6510475 (D.N.J. Dec. 13, 2013) ......................................... 11

*Singh v. Jutla & C.D. & R's Oil, Inc.*,
   214 F. Supp.2d 1056 (N.D. Cal. 2002).................................... 12, 13, 16

*Sure-Tan Inc. v. NLRB*,
   467 U.S. 883 (1984) ........................................................................... 15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Zavala  v. Wal-Mart Stores Inc.*,
    393 F. Supp.2d 295 (D.N.J. 2005) ............................................................................. 16

*Zurich N. Am. v. Matrix Serv.*,
    426 F.3d 1281 (10th Cir. Okla. 2005) ...................................................................... 7

**Other Authorities**

1 Appleman Ins. L. & P., § 41 ....................................................................................... 14

8 U.S.C. § 1621(d) ......................................................................................................... 17

Cal. Bus. and Prof. Code § 6064(b) ............................................................................... 17

I.    **INTRODUCTION**

The Trustees devote the bulk of their Motion for Partial Summary Judgment to attempting to establish that when an employer commits a labor or employment violation involving an undocumented alien, or when an undocumented alien is injured at the workplace, that undocumented alien has a *right* to recover certain *remedies* for such violations/injuries.  These are straw man arguments that are not in dispute.  Indeed, the authorities the Trustees cite for these propositions firmly support Sun Life's position in this litigation.   Enforcement of statutory mandates is not at issue here.  At issue here is the Trustees' request for non-mandatory private insurance reimbursement coverage for expenses incurred on behalf of a worker [Participant X[1]] who, as an undocumented alien, procured employment and benefits enrollment through fraudulent submission of an invalid Social Security Number ("SSN").  Such a worker certainly has rights as a human being but such rights do not include non-mandatory insurance coverage such as at issue here.   That is because, without a valid SSN, such a worker simply "cannot meet the policy requirement of employment [with the participating employer] in a lawful manner."  *See Garcia v. American United Life Insurance Company*, 2009 WL 6327459 (E.D. Texas December 9, 2009)(Report and Recommendation), adopted by 2010 WL 1379106 (E.D. Texas March 31, 2010), affirmed on appeal, 422 Fed. Appx. 306 (5th Cir. 2011).  As the only Court to have expressly considered the issue concluded, where, as here, the worker in question "was not eligible for employment. . . and thus not lawfully employed . . . [a] denial of benefits [is required]."  *Id.*

As explained below in detail and in Sun Life's Motion for Summary Judgment, *Garcia* is directly on point.  The Trustees' efforts to distinguish *Garcia* on its facts all fail and, significantly, the Trustees mount no substantive challenge to the *Garcia* Court's rationale.  Sun Life is entitled to judgment.

---

[1] For privacy reasons, Sun Life refers to the worker in question as "Participant X."

## II.   UNDISPUTED FACTS

Sun Life has set forth the undisputed, material facts in its Motion for Summary Judgment, Separate Statement of Facts, and Response to Plaintiff's Statement of Facts.  Sun Life will not repeat those facts but rather incorporates them by reference herein.

### A.   ARGUMENT

#### 1.   The Trustees' argument that the legality of Participant X's "employee" status is irrelevant with respect to coverage under the Stop-Loss Policy, is untenable and erroneous.

The Trustees argue that under the "clear and unambiguous language of the [Stop-Loss] Policy", Participant X was an "employee" entitled to coverage, regardless of the legality of such "employment" status and regardless of whether the SSN he submitted, which the Trust provided to Sun Life as "Proof of Claim", was valid.  Plaintiff's Motion at p. 13.  The Trustees cite no authority for the proposition that legal "employee" status is irrelevant to eligibility for coverage under a non-mandatory, private insurance policy available only to "employees."  That is because such a proposition is contrary to both common sense and governing law.

In fact, the Court in *Garcia* expressly rejected the proposition the Trustees put forth. In *Garcia*, the plaintiff argued, just as the Trustees argue here, that in order for legality of employment to be relevant to employee status under a private insurance policy, the policy would have to expressly cover only "lawful" employees. 2009 WL 6327459 at *10.  The *Garcia* Court found that argument meritless and instead specifically held that the unauthorized worker "cannot meet the policy requirement of 'employment with the Group Policyholder' in a lawful manner", that his "undocumented status prevents him from legally obtaining employment, let alone coverage under a group insurance policy" and that "[the insurer] *correctly* determined that [the unauthorized worker in question] was not eligible for employment with [the employer] and thus not lawfully employed . . . , *requiring denial of benefits . . .*"  *Id.* (emphasis added).

In so ruling, the *Garcia* court found the Supreme Court's decision in *Hoffman Plastic Compounds v. National Labor Rel. Bd.*, 535 U.S. 137, 147, 122 S.Ct. 1275, 1282 (2002)(interpreting the Immigration Reform and Control Act of 1986 ("IRCA"))  instructive, stating:

> Salvador [the worker in question] was never lawfully entitled to be present or employed in the United States. In fact, Salvador was eligible for coverage "only by remaining inside the United States illegally." *Id., citing Hoffman*, [535] U.S. at 150. Because Salvador was an un-documented alien, his employment with [the employer] was procured in contravention of explicit congressional policies -- namely, by Salvador's tendering fraudulent identification information to Tatum [the employer] . . .  Like the NLRB in *Hoffman*, Plaintiff asks that the Court overlook this critical fact and require the payment of life insurance benefits on the life of an illegal alien for coverage that was only obtained due to the securing of employment in the first instance by criminal fraud. As urged by American [the group insurer], to require it to pay benefits in this situation "would unduly trench upon explicit statutory prohibitions" embodied in the IRCA that are critical to federal immigration policy, "encourage the successful evasion of apprehension by immigration authorities, condone prior violations of the immigration laws, and encourage future violations."

*Id.*, (quoting *Hoffman Plastic*, 535 U.S. at 150-151).

*Garcia's* core rationale, that implicit in every contract is the requirement that it be entered into legally, makes sense.  At bottom, the primary aim in construing insurance contracts is to give "effect to the mutual intent of the parties" by interpreting the terms used in their "ordinary and popular sense."  *Kohlhase v. Safeco Ins. Co.*, 484 Fed. Appx. 106, 107 (9th Cir. 2012).  It defies logic to conclude that use of the term "employee" in its "ordinary and popular sense," includes a worker who cannot, under federal law, legally become employed in the first place but who nonetheless submits a fraudulent SSN in an effort to subvert U.S. law.

Moreover, as both the District Court and the Fifth Circuit held in *Garcia*, an "applicant's SSN is a vital piece of information pertinent to the insurer's accurate identification of the person seeking to be insured" (2010 WL 1379106 at *4), a "SSN is an integral part of the process by which a party's identity can be verified" (422 Fed. Appx. at 312) and "*eligibility for employment under the U.S. immigration laws would be material for any plan.*"  (2010 WL 1379106 at *4

3

1    (emphasis added)).  *Cf., e.g., Lincoln Nat. Life v. Schlanger*, 28 A.3d 436, 441 (Del.

2    2011)(explaining difference between contracts that are void ab initio and voidable contracts, and

3    holding that insurance contract entered into without an insurable interest was void ab initio as an

4    illegal wager on human  life, because such illegality goes "to the very character of the proposed

5    contract itself. . .").  In the same way that a court will not enforce a private contract to pay life

6    insurance benefits to a policyholder where the contract involves an illegal wager on the life of the

7    insured, the *Garcia* Court correctly held that an insurance company is not required to pay benefits

8    reserved for "employees", on behalf of an individual who cannot legally become one but

9    fraudulently, and illegally, represents that he can through use of an invalid SSN.

10          Finally, it is important to note that the language of the Stop-Loss Policy not only limits

11   coverage to "employees" but also requires, as necessary "Proof of Claim", that the Trust submit

12   "[a] copy of the Covered Person's original enrollment record."  Ex. B to Rollinson Aff. at p. 14.

13   The form used by the Trust as the "original enrollment record", specifically requires enrollees to

14   provide a SSN. Ex. F. to Rollinson Aff. Participant X signed the form and swore to the truthfulness

15   of the information set forth therein.  *Id.*  But the information was not true.  It was fraudulent and

16   the SSN provided was not valid.  Ex. M to Rollinson Aff.  For the Trustees to now argue that it

17   simply does not matter whether Participant X's SSN was valid or not, when the Trustees

18   themselves specifically required Participant X to provide a SSN on the form the Trustees used as

19   "Proof of Claim" under the Stop-Loss Policy, is disingenuous.  The Trustees ask this Court to

20   "overlook the fact that [Participant X] submitted a false SSN . . . ostensibly to become employed

21   by [the employer], so that [his beneficiaries] may benefit from a policy for which [Participant X]

22   would not otherwise have been eligible." *Garcia*, 422 Fed Appx. at 312.  Pursuant to *Garcia*,

23   pursuant to the "ordinary and popular meaning" of the term "employee" in the Stop-Loss Policy,

24   and pursuant to the Proof of Claim provisions in the Stop-Loss Policy, Participant X was not

25   entitled to coverage as a matter of law and Sun Life is entitled to judgment.

## 2.      The Trustees' efforts to distinguish *Garcia* fail.

Sun Life explained in its Motion for Summary Judgment why the Trustees' efforts to distinguish *Garcia* during the claims process, were meritless.  Sun Life's Motion at p. 9.  The Trustees, however, offer nothing more in their Motion.  The Trustees vainly attempt to describe *Garcia* in general terms, while making absolutely no effort to address the specific language the *Garcia* court used that is directly on point here.  The Trustees characterize *Garcia* as follows: "[In *Garcia*, t]he magistrate judge . . . recommended that [the insurer's] motion be granted. . . on the basis that [the insurer] had not abused its discretion in rescinding coverage post-death."  Plaintiff's Motion at 18. The Trustees then go on to state that the District Judge in *Garcia* "explained that the factual determination of whether Mr. Garcia was or was not a legal resident or legal employee in this country would be subject to an abuse of discretion review and [the insurer] reasonably relied on Mr. Garcia's immigration status in determining his eligibility for benefits."  *Id.* Apart from the Trustees' failure to even mention that a three judge panel of the Fifth Circuit upheld the decision, their characterization of *Garcia* is blatantly false.  Sun Life urges the Court to review the actual language used by the 5 judges who unanimously agreed with Sun Life's position under identical circumstances, rather than the Trustees' erroneous characterization of same.

First, it is true that the insurer in *Garcia* took the extra step of "rescinding" the worker's certificate in addition to denying the claim.  But the Trustees fail to explain how that belt and suspenders action by the insurer in *Garcia* in any way calls into question the *Garcia* court's holding that the insurer made the "legally correct" coverage determination, regardless of any rescission.  In fact, as here, the *Garcia* case involved a group insurance policy, not an individual policy.  And the *Garcia* court made crystal clear that, just as in this case, regardless of any rescission, the worker could not satisfy the fundamental requirement for coverage in the first place; legal employment with the employer.  2009 WL 6327459 at *10 (stating that worker was incapable of "legally obtaining employment, *let alone* coverage under a group insurance policy.") *Id.* (the

unauthorized worker "cannot meet the policy requirement of 'employment with the Group Policyholder' in a lawful manner")(emphasis added); *Id.* ("[the insurer] *correctly* determined that [the unauthorized worker] was not eligible for employment . . . and thus not lawfully employed . . . *requiring denial of benefits*. . .") (emphasis added).

Second, as explained in Sun Life's Motion for Summary Judgment, pp. 9-11, the Trustees are simply wrong when they claim that all the court did in *Garcia* was uphold the insurer's decision under a deferential, "abuse of discretion" standard.  In fact, the *Garcia* court's inquiry and determination went far beyond whether or not the insurer "abuse[d] its discretion" as the Trustees erroneously state.    To the contrary, the *Garcia* court first considered the "legally correct" interpretation and affirmatively held that the insurer's decision was "legally correct" (i.e. correct in the absence of any deference), pursuant to the Fifth Circuit's legal rubric, before ever proceeding to the issue of abuse of discretion.  2009 WL 6327459 at *10.  *Id.* (holding that the insurer's decision was "correct", not simply "reasonable"). *See also* 422 Fed. Appx. at 312 (refusing to "overlook the fact that [the unauthorized worker] submitted a false SSN . . . ostensibly to become employed . . . , so that [his beneficiary] may benefit from *a policy for which [he] would not otherwise have been eligible*" and stating that the insurer's determination was "legally correct.").  Indeed, the court specifically held that "*eligibility for employment under the U.S. immigration laws would be material for any plan.*" (2010 WL 1379106 at * 4)(emphasis added)).  This is not language of "deference" and the Trustees' failure to even acknowledge it simply reinforces its applicability.

### a.  The Trustees' position deserves no deference.

In light of the foregoing, it is curious that the Trustees state that "assuming arguendo that the legal reasoning of *Garcia I* and *Garcia II* applies to this case, then the Joint Board's coverage determination is entitled to deference unless it constituted an abuse of discretion."  Plaintiff's Motion at p. 19.  As the clear language from *Garcia* demonstrates, acceptance of the *Garcia* court's "legal reasoning" (that an unauthorized worker is incapable of "legally obtaining

employment, let alone coverage under a group insurance policy" and that such is the "legally correct" determination under an insurance policy that limits coverage to "employees") requires a decision in Sun Life's favor.  Significantly, the Trustees make no substantive effort to grapple with the *Garcia* court's rationale, instead unsuccessfully attempting to distinguish *Garcia* on its facts.

Moreover, as Sun Life has already explained, the cases the Trustees cite for the proposition that their alleged "coverage determination" is entitled to deference, are inapposite.  Sun Life's Motion for Summary Judgment at pp. 15-16 (discussing *Computer Aided Design Sys. v. Safeco*, 235 F. Supp. 2d 1052, 1059 (S.D. Iowa 2002) aff'd by 358 F.3d. 1011 (8th Cir. 2004); *Reg'l Care Servs. Corp. v. Companion Life Ins. Co.*, 869 F. Supp. 2d 1079, 1089-1091 (D. Ariz. 2012); *Zurich N. Am. v. Matrix Serv.*, 426 F.3d 1281, 1288-1289 (10th Cir. Okla. 2005)).  As Sun Life explained, in each of these cases the stop-loss policy in question expressly incorporated the underlying plan in the definition of the entire "contract" between the two parties.

Here, the Stop-Loss Policy not only does not include such an express incorporation provision, it contains several provisions which conclusively establish Sun Life's affirmative right to make its own determination regarding eligibility for coverage and the sufficiency of the Trustees' submitted "Proof of Claim", which in this case, was undisputedly fraudulent.  *See id.* (citing Ex. B. to Rollinson Aff. at p. 20 (setting forth definition of "Entire Contract" which did not include the plan); *id.* at p. 18 (("For the purpose of determining Eligible Expenses under the Policy, We have the right to determine whether an Eligible Expense was paid by you in accordance with the terms of your Plan.").  *Id.*  ("We have the right to require documentation from You that demonstrates You paid an Eligible Expense and that payment was made in accordance with the terms of your Plan.").  *Id.* at p. 14 ("Written proof of claim in a form and content satisfactory to Us, must be provided to Us as soon as reasonably possible . . ."  Proof of claim "shall include . . . [a] copy of the Covered Person's original enrollment record" and "any additional information We may require to fulfill Our obligations under this Policy.").

As also already explained by Sun Life in its Motion for Summary Judgment at pp. 17-19, there is also no evidence here of any actual exercise of discretion to which deference could be owed.  The Trustees baldly refer to their "coverage determination" but there is no evidence that they actually made one.  *See id.* (discussing *AG Equip. Co. v. AIG Ins. Co*., 2009 WL 223106 at *7 (N.D. Okla. Jan. 28, 2009). Simply paying Participant X's claims is not an exercise of discretion. The court in *AG Equip*. expressly rejected a similar argument, noting that the policyholder failed to present any evidence that before the dispute with the stop-loss carrier arose, it ever actually exercised any discretion to adopt the interpretation it subsequently espoused.  *Id.   See also AG Equip. Co. v. AIG Ins. Co*., 636 F. Supp. 2d 1210, 1224 (W.D. Okla. 2009).  The same is true here.

In sum, the Trustees' efforts to foist their post-hoc "coverage determination" onto Sun Life fail.  The Trustees cite no authority, and there is none, that supports their odd argument to the effect that the mere payment of Participant X's claim by the Trust, somehow binds Sun Life to accept an undisputedly fraudulent "Proof of Claim" submission and provide coverage for a worker who, under federal law, was undisputedly ineligible for the coverage he fraudulently attempted to enroll in.  This is the fundamental point that the Trustees simply fail to grasp.  There is no dispute that an undocumented alien who submits an invalid SSN is not eligible for employment in the United States and therefore not eligible for coverage under a policy limited to "employees."   But yet the Trustees argue that Sun Life was nonetheless required to provide such coverage to a worker who was ineligible for it.  This argument fails.

          **b.**      **Sun Life's review and investigation of the Trustees' Proof of Claim, pursuant to the terms of the Stop-Loss Policy, is not "post-claims underwriting."**

Similarly unavailing is the Trustees' attempt to accuse Sun Life of so-called "post-claim underwriting" and to distinguish *Garcia* on this basis as well. The Trustees boldly state that "Sun Life . . . cannot seriously argue that Participant X's . . . immigration status was material to its

decision to issue the Policy. . ."  Plaintiff's Motion at 19.  Here the Trustees mix up legal concepts and apparently miscomprehend Sun Life's position.  Sun Life did not and does not claim that the Stop-Loss Policy should be rescinded.  Sun Life does, however, "seriously argue", as the *Garcia* Court expressly held under identical circumstances, that Participant X was not "eligible for employment . . . and thus not lawfully employed . . . , *requiring denial of benefits . . . .*"  2009 WL 6327459 at *10 (emphasis added).  In this case, just as in *Garcia*, Participant X was ineligible for coverage in the first place, as a matter of law.  As *Garcia* held, "*eligibility for employment under the U.S. immigration laws would be material for any plan.*"  (2010 WL 1379106 at *4 (emphasis added)).

Moreover, the Trustees' suggestion that Sun Life was somehow required to check the "immigration status" of all the hundreds of plan enrollees prior to issuing the Stop-Loss Policy, constitutes a fundamental misunderstanding of the nature of group insurance.  The Trustees cite no authority for this contention because there is none.  The nature of group insurance is that policyholders obtain a low cost for coverage that is not individually underwritten.  1 Appleman Ins. L. & P., § 41 (low premium rates characterize group insurance contracts).  But by foregoing individual underwriting, the insurer in no way forfeits the right to contest eligibility for coverage upon receipt of a claim, when review of the Proof of Claim reveals that the worker in question was not eligible for such coverage, per the terms of the policy.

As stated, the Stop-Loss Policy specifically sets forth Sun Life's right to make such determinations at the time a claim is filed.  Ex. B to Rollinson Aff. at p. 14 ("Written proof of claim in a form and content satisfactory to Us, must be provided to Us as soon as reasonably possible . . .") ("Proof of claim shall include . . . [a] copy of the Covered Person's original enrollment record" and "any additional information We may require to fulfill Our obligations under this Policy.").  *Id.* at p. 18 ("For the purpose of determining Eligible Expenses under the Policy, We have the right to determine whether an Eligible Expense was paid by you in accordance

with the terms of your Plan.").  *Id.*  ("We have the right to require documentation from You that demonstrates You paid an Eligible Expense and that payment was made in accordance with the terms of your Plan.").  *Id.* Per the clear terms of the Stop-Loss Policy, if Sun Life's review and investigation of the Proof of Claim submitted reveals that the person in question was not in fact eligible for coverage under the policy, then Sun Life has every right to deny the claim and return the premiums.

Thus, for example, in *AG Equip. Co. v. AIG Ins. Co.*, 636 F. Supp. 2d 1210 (W.D. Okla. 2009) the stop-loss insurer properly denied the policyholder's claim for reimbursement after the insurer's claim investigation revealed that the employee did not work the requisite number of hours to be eligible for coverage which was limited to "full-time" employees.  In *Bowes v. Lakeside Indus, Inc.*, 209 N.W.2d 900 (MN 1973) the group insurer properly denied a claim for benefits under a group policy available only to "employees", where the worker in question had ended his employment relationship with the policyholder and became a consultant, but the policyholder continued to include the worker's name in the headcount of insured employees, and continued to pay premiums on his behalf.  And in *Garcia*, the insurer properly denied a beneficiary's request for benefits where policy coverage was limited to "employees" and the worker in question was an undocumented alien prohibited from being "legally employed" by the policyholder, pursuant to U.S. immigration law. 2009 WL 6327459 at *10.

In each of these cases the insurers made these determinations *upon receipt of a claim* and were not required to embark upon such investigations of all enrolled employees prior to issuance of the policy.  If that were required, insurers could no longer offer group policies at favorable rates. *See e.g., CLARCOR, Inc. v. Madison Nat. Life Ins. Co.*, 491 F. App'x 547, 553 (6th Cir. 2012) ("acceptance of premiums does not alter the unambiguous coverage requirements of the Plan and Policy"); *Fink v. Union Cent. Life Ins. Co.*, 94 F.3d 489, 492 (8th Cir. 1996) (rejecting plaintiff's claim that life insurance carrier was prohibited from accepting "premium payments on

[employee's] behalf without verifying [employee's] eligibility."); *Lewis v. Kratos Def. & Sec. Solutions, Inc.*, 950 F. Supp. 2d 851 (E.D. Va. 2013); *Moon v. BWX Technologies, Inc.*, 956 F. Supp. 2d 711, 718 (W.D. Va. 2013)(no requirement that group insurer check eligibility of all enrolled employees); *Rowello v. Healthcare Benefits, Inc.*, 2013 WL 6510475, at *7-9 (D.N.J. Dec. 13, 2013)(same).  As a practical matter, acceptance of the Trustees' argument would bring an end to group insurance due to the impossibility of investigating the eligibility of millions of potential enrollees prior to policy issuance.

In sum, Sun Life's claims investigation in no way constitutes so-called "post-claim underwriting."  This case has nothing to do with underwriting at all.  This case deals with eligibility for private group insurance coverage as a matter of law.  Sun Life properly denied the claim after correctly determining, upon review and investigation of the "Proof of Claim" the Trustees submitted, that Participant X was not eligible for coverage, as the Stop-Loss Policy specifically allowed Sun Life to do.  The Trustees' argument that Sun Life was required to provide coverage despite the fact that the "Proof of Claim" submitted was undisputedly fraudulent, defies all common sense and logic, as well as the plain language of the Stop-Loss Policy.  It is doubtful that the Trustees would even contest Sun Life's decision if the worker in question was not a lawful employee for some other reason such as, for example, age.  The Trustees' attempt to argue that the situation is different because Participant X was an undocumented alien, is meritless and fails.

C.     **The Trustees attack a straw man with their repeated focus on the undisputed but irrelevant fact that undocumented aliens may enforce certain mandatory provisions of state and federal law.**

The Trustees claim that Sun Life's position is "contrary to laws of the State of California, as well as Federal law and public policy."  As support, the Trustees cite authorities which hold that undocumented aliens are entitled to enforce and seek redress for employers' violations of labor and employment laws.  Plaintiff's Motion at pp. 13-14.  Sun Life has already addressed this argument in its Motion for Summary Judgment at pp. 11-13.  As Sun Life explained, this argument is a straw

11

man because Sun Life does not dispute that undocumented aliens may enforce certain mandatory provisions of state or federal labor, employment and workplace safety laws, and that they may obtain some, but not all, of the same remedies that are available to legal employees under the applicable statutes.  But that is not the issue here.  The issue here is whether someone who cannot legally be employed pursuant to U.S. immigration law should nonetheless be considered an "employee" for the purpose of a non-mandatory, private insurance contract.  As explained above, the answer is no.

As the Supreme Court reiterated in *Arizona v. United States*, 132 S.Ct. 2492 (2012), Congress has comprehensively regulated the field of alien employment. Although a state may make certain types of public benefits available to undocumented aliens, it can only do so pursuant to a statute which "affirmatively provides for such eligibility."  8 U.S.C. § 1621(d).  For instance, the California Supreme Court recently found that the Legislature had enacted such a provision that allows undocumented aliens to obtain licenses to practice law.  *In re Sergio C. Garcia*, 58 Cal.4th 440 (2014), 315 P.3d 117 (Cal. 2014) (discussing Cal. Bus. and Prof. Code § 6064(b)). Significantly, however, the court recognized that no California statute could authorize such undocumented aliens to become "employees", as any such attempt would be contrary to and preempted by IRCA.  *See id.* The Court specifically held that "federal law would prohibit an undocumented immigrant who lacks work authorization from practicing law as an "employee" of a law firm, corporation, or governmental entity."  *Id.* While on the one hand the Court recognized the right of an undocumented alien to obtain a law license, it further reiterated that such a worker cannot be an "employee".  This is directly consistent with Sun Life's position here.

Thus, whenever a legislature allows undocumented aliens to enforce mandatory provisions of labor, employment, or workplace safety laws, the question arises as to whether the rights and remedies afforded run contrary to and are preempted by IRCA. This requires courts to balance the policies that promote enforcement of the laws in question, with Congress' intent to occupy the field

with respect to immigration.  *See, e.g., Singh v. Jutla*, 214 F. Supp.2d 1056, 1061-62 (N.D. Cal. 2002)(noting that when determining the extent to which undocumented aliens can seek *remedies for violations of labor or employment law*, "economic incentives are in tension . . . [and thus] court must attempt to sensibly balance competing considerations.")(emphasis added).  Such balancing requires courts to consider whether the rights or remedies afforded stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Florida Avocado Growers v. Paul*, (1963) 373 U.S. 132, 141 [10 L.Ed.2d 248, 83 S.Ct. 1210].)

The point for these purposes, however, is that no such balancing is required here because enforcing mandatory statutory provisions is not at issue.  To the contrary, no legislature or court ever has or ever could purport to require that undocumented aliens who obtain employment through fraudulent submission of an invalid SSN, be considered "employees" (as the California Supreme Court stated in *In re Sergio C. Garcia*), let alone for the purpose of non-mandatory, contractual insurance coverage between private parties.  To do so would run directly afoul of IRCA, as the court specifically held in *Garcia*:

> Like the NLRB in *Hoffman*, Plaintiff asks that the Court overlook this critical fact and require the payment of life insurance benefits on the life of an illegal alien for coverage that was only obtained due to the securing of employment in the first instance by criminal fraud. As urged by American [the group insurer], to require it to pay benefits in this situation "would unduly trench upon explicit statutory prohibitions" embodied in the IRCA that are critical to federal immigration policy, "encourage the successful evasion of apprehension by immigration authorities, condone prior violations of the immigration laws, and encourage future violations."

2009 WL 6327459 at *10 (quoting *Hoffman Plastic*, 535 U.S. at 150-151).[2]

---

[2] The Trustees attempt to distinguish *Hoffman Plastic* on its facts and argue that *Hoffman Plastic* does not preclude undocumented aliens from enforcing certain labor or employment violations and obtaining certain remedies for such violations.  Plaintiff's Motion at 20.  Again, this is true but irrelevant here.  *Hoffman Plastic* does not preclude undocumented aliens from recovering certain statutory remedies when they are injured or when employers violate the law, but it undisputedly does preclude them from becoming "employed" in the first place and Participant X is ineligible for the coverage in question here unless he is an "employee."  *See In re Sergio C. Garcia*, 58 Cal.4th 440(2014), 315 P.3d 117 (CA. 2014)(undocumented aliens may obtain licenses to practice law but cannot do so as "employees").

None of the authorities the Trustees cite are in any way to the contrary. For example, the Trustees cite the California Court of Appeals decision in *Farmers Brothers Coffee v. Wkr's Comp. App. Bd.*, 133 Cal. App.4[th] 533 (2005). *Farmers Brothers* addressed whether IRCA preempts the California legislature's decision to declare that "[f]or purposes of enforcing state labor and employment laws, [specifically worker's compensation laws] a person's immigration status is irrelevant to the issue of liability. . ." *Id.* at 538. The Court held that IRCA does not preempt California's efforts to enforce its Worker's Compensation law, even when the injured worker is undocumented, noting that such laws are a traditional part of state police powers the purpose of which is to "furnish, expeditiously and inexpensively, treatment and compensation for persons suffering a workplace injury, irrespective of the fault of any party, and to secure workplace safety." *Id.* The Court held that "since the IRCA does not provide for or prohibit compensation for injured workers, Congress has not occupied the field of worker's compensation [for such injuries]." *Id.* at 540. With respect to the fact that the worker in question submitted false documentation, the Court noted that "[i]t was employment, *not the compensable injury*, that [the worker] obtained as a direct result of the use of fraudulent documents." *Id.* at 543 (emphasis added).

*Farmers Brothers* does not help the Trustees. Workers' compensation is a mandatory, statutory remedy that is a substitute for tort claims. *See Bollinger Shipyards v. Director*, 604 F.3d 864, 878 (5th Cir. 2010).[3] Enforcing such laws regardless of the immigration status of the injured worker is necessary to further the laws' purpose of securing "workplace safety." *Farmers Brothers*, 133 Cal. App.4[th] at 540. Thus, *Farmers Brothers* stands for the proposition that, pursuant to an express statutory provision enacted by the California legislature, even a worker who

---

[3] *Bollinger Shipyards*, a decision by the Fifth Circuit, holds that undocumented aliens may enforce workers' compensation laws and is therefore consistent with the California Court of Appeals decision in *Farmers Brothers*. The fact that the Fifth Circuit also held in *Garcia* that undocumented aliens are not eligible for private insurance coverage of the type at issue here because they "cannot meet the policy requirement of employment [with the participating employer] in a lawful manner", affirmatively demonstrates that the Trustees' reliance on *Farmers Brothers* is misplaced. *Farmers Brothers*, like *Bollinger Shipyards*, is in no way contrary to *Garcia*.

secures employment through submission of false documentation, may enforce the applicable workplace safety laws.  In so holding, it was necessary for the court to conclude both that the legislature had expressly included undocumented aliens among the persons entitled to enforce these mandatory laws, and that, pursuant to the balancing analysis described above, such inclusion did not directly conflict with IRCA.[4]  The same is not true here.

Coverage under an insurance policy of the type at issue is not mandated by any law.  It is not, like workers' compensation, a mandatory statutory remedy that takes the place of tort liability. Nor is it compensation for injury incurred on an employer's watch.  To the contrary, employers are free to provide whatever contractual welfare benefits they want to whatever class of workers they want.  Employers are also free to provide no such benefits at all.  *See e.g., Lockheed v. Spink*, 517 U.S. 882 (1996)(federal law neither requires employers to offer employment benefits nor mandates what kind of benefits they must provide if they choose to provide them).  Thus, contractually insured benefits of the type at issue here constitute neither a "right" nor a "remedy."  And this insurance dispute does not present any concern about enforcing federal or state workers' compensation, employment, labor, or civil rights law.  The issue here is whether the Stop-Loss Policy, a private insurance contract between two business entities, requires Sun Life to provide coverage to workers who procure their employment through fraud, and are not legally employed in the U.S. in violation of federal law.

---

[4] The same balancing of competing interests in an effort to enforce statutory mandates, also lies at the heart of each of the NLRA, FLSA and Title VII cases the Trustees cite.  *See, e.g., Sure-Tan Inc. v. NLRB,* 467 U.S. 883 (1984)(holding, pre-IRCA, that allowing undocumented aliens to enforce NLRA violations furthers purpose of protecting working conditions of legal residents); *Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1069 (9th Cir. 2004)(holding that undocumented aliens can seek certain redress for Title VII violations, in light of Title VII's "central statutory purpose" of "eradicating discrimination throughout the economy. . ."); *Patel v. Quality Inn South*, 846 F.2d 700, 705-06 (11th Cir.1988)(allowing undocumented aliens to enforce FSLA violations helps discourage illegal immigration).

In sum, unlike in the workers' compensation scenario (where employers are statutorily required to provide no-fault reimbursement for all injured workers as the quid pro quo for avoiding tort liability) no law requires an insurer to provide the coverage at issue here. And unlike in the workers' compensation scenario, here there is a direct link between the coverage in question and the submission of fraudulent documentation. Indeed, here, Participant X was eligible for coverage "only by remaining inside the United States illegally" and the "coverage . . . was only obtained due to the securing of employment in the first instance by criminal fraud." *Garcia*, 2009 WL 6327459 at *10. Just as the Court explained in *Hoffman Plastic*, adoption of the Trustees' argument here would "condone prior violations of the immigration laws, and encourage future violations." *Id.* The Court in *Garcia* refused to "ignore" this reality, as should this Court. The Trustees' argument that undocumented aliens may enforce particular mandatory statutory provisions is correct, but simply irrelevant here.[5]

---

[5] The Trustees also cite three cases decided under ERISA, *Molina v. Mallah Organization, Inc.*, 804 F. Supp. 504 (S.D.N.Y. 1992); *Garcia-Moreno v. Great-West Life & Annuity Ins. Co.*, 402 F. Supp. 2d 1031 (N.D. Iowa 2005); *Laborer's Pension Trust Fund v. Lange*, 2006 WL 891167 (E.D. Mich. March 27, 2006). *Molina* involved a scheme by defendant employers to defraud an ERISA plan established pursuant to a collective bargaining agreement, out of 6.7 million dollars, by hiring hundreds of workers, some of them undocumented aliens, but failing to cause them to join the union or make contributions on their behalf. The opinion contains no discussion whatsoever concerning the issues in this case. In *Garcia-Moreno*, the court reversed an insurer's decision to do an "about face" concerning payment of benefits without providing any explanation or basis for doing so. This decision also contains no discussion whatsoever of the issues involved in this case. *Lange* is a Recommended Decision by a Magistrate Judge in Michigan, that was never appealed to the District Judge. In *Lange*, the court upheld an award issued by a "Labor Relationship Committee" in response to a grievance filed by a labor union against an employer, ordering the employer to pay fringe benefit contributions and liquidated damages under a collective bargaining agreement. In rejecting the employer's attempt to exclude contributions on behalf of an undocumented alien, the court stated that

> every court that has considered the issue under the Fair Labor Standards Act has concluded that neither *Sur-Tan* nor *Hoffman Plastic* prohibit an award to an undocumented worker of wages earned for hours that have actually been worked by the employer. *See Patel v. Quality Inn South*, 846 F.2d 700, 705-06 (11th Cir.1988); *Galaviz-Zamora v. Brady Farms, Inc.*, 230 F.R.D. 499, 501 (W.D.Mich.2005); *Zavala v. Wal-Mart Stores*, Inc., 393 F.Supp.2d 295, 322-23 (D.N.J.2005);*Flores v. Amigon*, 233 F.Supp.2d 462, 463-64 (E.D.N.Y.2002); *Singh v. Jutla & C.D. & R's Oil, Inc.*, 214 F.Supp.2d 1056, 1061-62 (N.D.Cal.2002).

In each of the cited cases, the court held that an undocumented alien could enforce and seek

**D.**   **The Court should reject the Trustees' erroneous and inconsistent arguments to the effect that Sun Life's efforts to verify the Proof of Claim submitted, were at the same time both improper and insufficient.**

The Trustees inconsistently argue that it was "improper" for Sun Life to make any effort to verify the Proof of Claim the Trustees submitted and that Sun Life's efforts in that regard were insufficient.  These arguments fail.

The Trustees claim that only an employer may seek to verify the "immigration status" of workers and that it was somehow improper for Sun Life to attempt to verify the identity of the person on behalf of whom coverage was sought.  Plaintiff's Motion at p. 23.  This contention defies common sense and is directly contrary to *Garcia*.  The District Court in *Garcia* held that an "applicant's SSN is a vital piece of information pertinent to the insurer's accurate identification of the person seeking to be insured."  2010 WL 1379106 at *4.  The Fifth Circuit in *Garcia* reiterated again that a "SSN is an integral part of the process by which a party's identity can be verified." 422 Fed. Appx. at 312.

The Trustees' contention to the contrary, that not only is a valid SSN absolutely irrelevant to payment of benefits under a private insurance policy, but also that it is somehow improper for an insurance company to attempt to verify the SSN set forth on the Proof of Claim submitted, is entirely untenable.  The practical ramifications of requiring insurers to provide benefits on behalf of individuals whose identities cannot be verified, are legion.  Insurers would be unable to ascertain the true identity, address, age or other characteristics necessary for accurate payment of benefits in a number of different insurance contexts.  In short, insurers could never be sure to whom they were

---

remedies, including an award of wages for work actually performed, *as damages for employers' violations of the FSLA*.  This result, the courts all reasoned, was necessary in order to discourage employers from both violating the FSLA and as a disincentive to hire undocumented workers.  *See Jutla*, 214 F. Supp. 2d at  1062 (discussing the "balancing of competing considerations" that must take place when determining which *remedies* an undocumented alien can obtain *for violations of federal labor laws*).  As stated, enforcement of labor laws is not at issue here.  The issue here involves non-mandatory, contractual insurance coverage.  In this specific context, *Garcia*, not any of these cases, is directly on point.

paying benefits.  Further, as noted by the Fifth Circuit in *Garcia*, insurers are prohibited from engaging in transactions in any way involving persons on the federal government's Specially Designated Nationals List, which includes the names of individuals designated as terrorists, drug dealers and money launderers.  422 Fed. Appx. at 312.  Without a valid SSN, insurers cannot be sure whether they are potentially violating this provision.

The Trustees may well be absolutely right that IRCA places certain limitations *on employers' actions,* with respect to IRCA's enforcement scheme.  These limitations are necessary in order to prevent employers from discriminating against aliens or otherwise violating the law.  But as explained above in detail, such issues and such balancing concerns do not exist here.[6]  Here, Sun Life simply attempted to do what the Stop-Loss Policy and sensible insurance practices allowed it to do; verify the validity of the SSN submitted by the Trust as Proof of Claim.  Sun Life's investigation revealed that the SSN set forth on the Proof of Claim was not valid but was in fact fraudulent. And the only judicial opinions to have expressly considered this precise issue, as affirmed by five separate judges, instructed Sun Life that a claim involving an unauthorized worker who "was not eligible for employment with [the employer] and thus not lawfully employed . . . , *require[es] denial of benefits . . .*"  *Garcia*, 2009 WL 6327459 at *10 (emphasis added).  In these circumstances, the Trustees' contention that Sun Life's efforts to verify the Proof of Claim it received were somehow improper, rings hollow.  Sun Life properly followed the guidance of the five judges who expressly considered the issue, rather than the Trustees' unpersuasive protestations to the contrary.

The Trustees' alternative inconsistent argument that Sun Life did not do *enough* to verify Participant X's status, fails for similar reasons.  The Trustees state that "a discrepancy regarding an

---

[6] It is important to note here that Sun Life's direct communications with the SSA in an effort to verify Participant X's identify, were made pursuant to an explicit and broad authorization form signed by Participant X and obtained from him by the Trustees.  Ex. N to Rollinson Aff.  As such, the Trustees' implication that Sun Life's investigation somehow exceeded proper boundaries, is false.

employee's social security number is not a sufficient basis for drawing conclusions about the employee's immigration status. *Aramark Facility Services v. Service Employees International Union, Local 1877*, 530 F.3d 817, 826 (9th Cir. 2008)."  Plaintiff's Motion at p. 22, n.4.  *Aramark* addressed the issue of "no match" letters and whether employers are allowed to take adverse employment action against workers based on them.  A "no match letter" is a form letter which the SSA sends to employers, typically in response to receiving an employee's wage report, that the name or SSN does not "match" a name or SSN combination reflected in the SSA's records. *Aramark*, 530 F.3d at 826.  This form letter, the purpose of which is entirely unrelated to immigration, includes a paragraph advising employers not to take any adverse employment action based solely on receipt of the letter, and further states that the letter makes no statement about the employee's immigration status. *Id.*  The form letter does ask the employer, and employee if necessary, to provide additional information to the SSA to help resolve the discrepancy.  *Id.*

*Aramark* is not applicable here, as *Aramark* involved a SSA no-match letter, and the firing of employees by the employer based solely on the form no-match letter the employer had received from the SSA.  Here, Sun Life is not Participant X's employer.  Sun Life cannot and did not take any adverse employment action against Participant X.  The Trustees' continued reliance on cases involving the balancing of competing interests inherent in the relationship between employers and undocumented aliens, is misplaced.

Moreover, a "no-match letter" was not involved here.  Here, Sun Life received, in response to a request accompanied by a broad authorization specifically executed by Participant X[7], an affirmative statement from the SSA that the SSN "doesn't belong to [Participant X]."  Ex. O to Rollinson Aff.  This statement contained none of the qualifying language typically set forth in a

---

[7] Again, the fact that Sun Life had an express authorization from Participant X to inquire directly from the SSA as to whether the supplied SSN was valid, further distinguishes this case from the policy concerns expressed by the Trust with respect to the limitations placed on *employers'* verification actions vis-à-vis their workers.

form "no-match" letter.  *Id.*  Indeed, it was not a form letter at all but rather a statement specifically directed at the precise question at issue; whether the SSN supplied by Participant X actually belonged to him.

In sum, under the Stop-Loss-Policy, the Trustees bore the burden of submitting "Proof of Claim."  Ex. B to Rollinson Aff. at p. 14.  Nonetheless, even after Sun Life's initial attempt to verify the SSN submitted revealed that it was invalid, Sun Life took additional steps to determine whether or not the SSN was valid, and repeatedly gave the Trustees opportunities to demonstrate the validity of the SSN provided.  All the information Sun Life obtained, however, confirmed Participant X's status as an unauthorized worker with no legal right to work in the United States. To briefly recap that investigation, upon receipt of the Trustees' Proof of Claim, Sun Life first checked the SSN listed on the claim form and the enrollment form for Participant X, by using Accurint.  Rollinson Aff. at ¶ 13.  The Accurint report showed that this SSN belonged to a person other than Participant X.  Ex. H to Rollinson Aff.  Subsequently, Sun Life then double-checked the accuracy of this information with Accurint's Data Team, which confirmed that the information it had on file showed that the SSN in question "is properly linked to another consumer, not [Participant X]."  Ex. I to Rollinson Aff.  Thereafter, Sun Life took the further step of attempting to verify Participant X's SSN with the Social Security Administration ("SSA"), obtaining a broad authorization from Participant X which allowed Sun Life to do so.  Ex. M to Rollinson Aff.  Again, the SSA affirmatively stated that the SSN listed for Participant X does not belong to Participant X. Ex. O to Rollinson Aff.  Even so, Sun Life nevertheless and repeatedly asked the Trust to provide any information it could to show that Participant X was lawfully employed.  Rollinson Aff. at ¶ 19. The Trust, which had the burden of providing "Proof of Claim", provided nothing.  *Id.*

Sun Life's investigation was both proper and complete.  The Trustees' inconsistent arguments to the contrary fail.  Sun Life is entitled to judgment.

1

**IV.    CONCLUSION**

2

    Based on the forgoing, Sun Life Assurance Company of Canada respectfully requests that

3

this Court deny Plaintiff's Motion and enter summary judgment in favor of Sun Life on all of

4

plaintiffs' claims for relief in this matter.

5

6

DATED:  May 30, 2014                    OGLETREE, DEAKINS, NASH, SMOAK &
                                        STEWART, P.C.

7

                                        PIERCE ATWOOD LLP

8

9

                                        By:   */s/ Sean P. Nalty*
                                              Sean P. Nalty

10

                                              Byrne J. Decker, *Pro Hac Vice*

11

                                        Attorneys for Defendant SUN LIFE

12

                                        ASSURANCE COMPANY OF CANADA

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM IN SUPPORT OF OPPOSITION TO MOTION  FOR SUMMARY JUDGMENT

1
2

## CERTIFICATE OF SERVICE

3

I hereby certify that on May 30, 2014, I electronically filed the within document using the

4

CM/ECF system which will send notification of such filing(s) to the following:

5
6
7
8
9
10
11

Richard C. Johnson (SBN 40881)
Anne M. Bevington (SBN 111320)
Shivani Nanda (SBN 253891)
SALTZMAN & JOHNSON LAW CORPORATION
44 Montgomery Street, Suite 2110
San Francisco, CA 94104
Telephone: (415) 882-7900
Facsimile: (415) 882-9287
djohnson@sjlawcorp.com
abevington@sjlawcorp.com
snanda@sjlawcorp.com

12

Dated:   May 30, 2014                                     */s/ Sean P. Nalty*_____
                                                              Sean P. Nalty

13
14
15
16

18030879.1

17
18
19
20
21
22
23
24
25
26
27
28